DECISION
Before this Court is an appeal from a July 13, 2006 decision of the Rhode Island Board of Regents for Elementary and Secondary Education ("Regents"). The Regents Decision affirmed (1) the termination of appellant Michael Dame from his position as a teacher in the Providence School Department and (2) the annulment of his teaching certificate. This case arises out of a classroom incident in which Mr. Dame closed a classroom door, the door contacted a student in the doorway, and the student suffered a laceration to his head. This Court has jurisdiction of Mr. Dame's appeal pursuant to G.L. 1956 § 42-35-15(g) of the Administrative Procedures Act (APA), G.L. 1956 § 16-13-4 (relating to review of termination decisions), and § 16-39-4 (relating to review of decisions by the Board of Regents).
 I Facts and Travel
The incident giving rise to this appeal occurred on May 7, 2003. Prior to the incident, Mr. Dame had been a special education teacher since 1989, and was a tenured *Page 2 
teacher at Mount Pleasant High School in Providence. (Tr. 158-59.) On the morning of May 7, 2003, Mr. Dame was covering an algebra class for an absent teacher during the second class period, which was usually a scheduled "prep" period for Mr. Dame. Id. at 167. During the class, students were being noisy and disruptive in the hallway. Id. at 175. Some students had even run in and out of the classroom as Mr. Dame was attempting to instruct a student. Id. at 179, 81. Mr. Dame admitted that he had become "irritated a little bit" from the repeated disruptions to the class. Id. at 200.
One of the disruptive children was Student H,[1] who was not in the algebra class. It is undisputed that Student H suffered a laceration to the head when Mr. Dame, after finishing a call on the classroom phone, pushed the classroom door into Student H. The parties disagree as to whether the injury resulted from Mr. Dame's intentional conduct, or whether the injury was accidental. It is also alleged that Mr. Dame induced the injured Student H to fabricate a false explanation of why his head was injured.
Following the incident, the Superintendent of the Providence Schools recommended that Mr. Dame be dismissed from his position. (Letter of Mr. Zimmerman to Mr. Dame, Aug. 8, 2003). Mr. Dame was subsequently dismissed after several days of hearings before the school board. (Decision of the Providence School Board, Oct. 22, 2003; Decision of the Providence School Board, May 26, 2004.) Pursuant to § 16-13-4, Mr. Dame appealed and requested a full de novo hearing before the Department of Education (DOE). (Letter of Atty. DeSimone to Commissioner McWalters, May 26, 2004.) *Page 3 
Prior to the scheduled hearing date, the DOE's Office of Teacher Certification (OTC) notified Mr. Dame that it would seek annulment of Mr. Dame's teaching certificate. (Letter of Mr. Anselmo to Atty. DeSimone, Aug. 19, 2004.) Under § 16-11-4, a teaching certificate may be "annulled for cause" after a hearing before the Commissioner of Education. Over Mr. Dame's objection, the Hearing Officer consolidated the hearings at the request of the OTC. (Tr. 24-25.) The Hearing Officer then conducted five days of hearings and issued her decision on August 17, 2005. By affixing his signature to the decision, the Commissioner adopted the Hearing Officer's findings. See id.
As to the dismissal, the Commissioner found by a preponderance of the evidence that Mr. Dame "had inappropriate physical contact with a student (slamming a door that struck the student's head)" and "told the student to falsely report an accident" on that date. Id. at 6. Therefore, the Commissioner found "good and just cause" for the dismissal. Id. at 7; see § 16-13-3 (requiring "good and just cause" to dismiss a tenured teacher).
As to annulment of Mr. Dame's teaching certificate, the allegations against Mr. Dame went slightly beyond those alleged in support of his dismissal. (Commissioner's Decision 7.) The OTC also relied on Mr. Dame's alleged use of profanity during the incident and continued inducement of Student H, beyond the date of injury, to fabricate the cause of injury. Id. The Commissioner found that these allegations were proved by clear and convincing evidence, and that Mr. Dame's conduct "demonstrates professional unfitness that is inimical to students' health, welfare and safety." Id. at 8. Therefore, the *Page 4 
Commissioner found that "cause" existed to annul the teaching certificate. See § 16-11-4 (requiring "cause" to annul).
Mr. Dame appealed the Commissioner's Decision to the Board of Regents.See § 16-11-4 (providing for appeal of annulment decisions to the Board of Regents); § 16-39-3 (providing for appeal to the Board of Regents of any decision of the Commissioner). On July 13, 2006, after oral argument, the Board of Regents issued a two-page decision affirming the Commissioner's Decision because the "findings of fact by the hearing officer have support in the record and are based on her independent hearing of the evidence and her judgment as to the credibility of those witnesses. They are therefore established as facts of this case. On those facts, we concur. . . ." (Regents Decision 2).
Mr. Dame appealed to this Court. He asks this Court to reverse the decisions of the Providence School Board, Hearing Officer, Commissioner, and Board of Regents.
 II Standard of Review
Mr. Dame is entitled to judicial review of the Regents Decision which affirmed his dismissal from employment and the annulment of his teaching certificate. See § 16-13-4 (providing for Superior Court review of dismissal decisions); § 16-39-4 (providing for review under the APA of decisions of the Board of Regents). That review is governed by the standards set forth in the APA. See § 16-39-4.
Therefore, except in limited circumstances not applicable here, the Court's review is confined to the record before the agency.See § 42-35-15(f). The Court may affirm the agency decision, or it can remand the case for further proceedings before the agency. Section42-35-15(g). The Court may also reverse or modify the decision if substantial *Page 5 
rights of the appellant have been prejudiced because the agency's findings or conclusions are
 "(1) In violation of constitutional or statutory provisions;
 (2) In excess of the statutory authority of the agency;
 (3) Made upon unlawful procedure;
 (4) Affected by other error or law;
 (5) Clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record; or
 (6) Arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion." See § 42-35-15(g).
The Court will not substitute its own judgment for that of the agency on questions of fact, but must defer to the agency's conclusions unless clearly erroneous. See, e.g., Bunch v. Board of Review, R.I. Departmentof Employment Training, 690 A.2d 335, 337 (R.I. 1997). Moreover, when credibility determinations are at issue, the findings of the Hearing Officer should be owed great deference. Rossi v. Employee'sRetirement System, 895 A.2d 106, 110 (R.I., 2006); See EnvironmentalScientific Corp. v. Durfee, 621 A.2d 200, 208 (R.I. 1993) (stating that, in a multi-tiered system of administrative review, the Hearing Officer's credibility determinations are owed great deference).
 III Whether Cause Exists for Dismissal, Annulment
In order to dismiss a teacher or to annul his teaching certificate, there must be "cause." See § 16-11-4 (requiring "cause" to annul); § 16-13-4 (requiring "good and just cause" to dismiss). The Hearing Officer found that Mr. Dame used profanity, inappropriately slammed a door into Student H, and induced that student to falsely report the cause of the accident. (Commissioner's Decision 6, 7.) She further found that these *Page 6 
acts constituted cause for dismissal and annulment. On appeal, Mr. Dame argues simply that the Hearing Officer was wrong: that she improperly relied on testimony of witnesses who were not credible, and improperly disregarded Mr. Dame's testimony in his favor.
Because the credibility of live witnesses is at issue here, Mr. Dame has a heavy burden to prevail on appeal. See Environmental ScientificCorp, 621 A.2d at 206. "Observations of live testimony necessarily enter into a determination" of what to believe and disbelieve, so this Court will defer to the findings of the Hearing Officer unless clearly wrong.Id. See also Town of Smithfield v Churchill Banks, Cos., LLC. 2007 R.I.Lexis 82 at page 14 (June 22, 2007).
The Hearing Officer received testimony from the school nurse who treated Student H; Mr. Dame's teaching assistant; Student H and three other student witnesses; Student H's mother, and Mr. Dame. She found that Mr. Dame knew of Student H's presence in the doorway, and that it was his presence that caused Mr. Dame to move from the telephone toward the door. (Commissioner's Decision 2, 7.) She further found that Mr. Dame intentionally slammed the door into Student H, that the door struck Student H in the head, and that the impact caused Student H to fall to the floor. Id.[2]
These conclusions were consistent with the testimony of Student C (Tr. 300-05), Student M (Tr. 368, 384), as well as the victim Student H (Tr. 462). In contrast, Mr. Dame testified that he closed the door only to shut out noise from the outside, and that he did not intend to close the door on any person. (Tr. 201.) Based on the testimony, as well as the sketches and photographs of the classroom in the record, the Hearing Officer *Page 7 
rejected Mr. Dame's position and found that he clearly must have seen Student H in the doorway. (Commissioner's Decision 7.)
Following the injury, Mr. Dame, Student H, and Student N went to the nurse's office.[3] According to Student N, she and Student H went separately and Mr. Dame caught up to them along the way. (Tr. 426, 428.) Mr. Dame then went to his regular classroom and met his teaching assistant, Robert Sauro, for the next class. Mr. Sauro testified that Mr. Dame admitted in a "boastful manner" that he had "slammed the [expletive] kid's head in the doorjamb and made him bleed."{ (Tr. 132, 133.) Mr. Dame never denied making this statement.[4] Mr. Dame made a similar admission, according to school nurse Mary Ann Lilla, when they discussed the incident later in the day. (Tr. 61-62, 102.) Mr. Dame contends that she misunderstood the meaning of his statements to her. (Tr. 216.)
Mr. Dame attempted to demonstrate that the various witnesses — the students and two school employees — were either lying or otherwise mistaken.[5] Indeed, the record reflects several inconsistencies in the details surrounding the incident.[6] However, the *Page 8 
operative facts found by the Hearing Officer — that Mr. Dame knew of Student H's presence in the doorway, and slammed the door anyway — are amply supported by the record, namely the eyewitness testimony in light of the physical layout of the classroom. That Mr. Dame acted intentionally is further supported by Mr. Dame's "boastful" admissions to Mr. Sauro and Ms. Lilla. This evidence is sufficient for the Hearing Officer to have found, by a preponderance of the evidence, that Mr. Dame intended to strike Student H with the door.[7] Therefore, the Hearing Officer's conclusion, that cause existed to dismiss Mr. Dame and to annul his teaching certificate, was not clearly erroneous.
The Hearing Officer also found that Mr. Dame induced Student H to lie about the cause of his injury. The record reflects that when they reached the school nurse's office, Student H told the nurse that he had "slipped on water." (Tr. 52.) Mr. Dame claims that Student H fabricated this story on his own, without any coercion, immediately after the impact of the door. (Tr. 202.) However, Student H contends that it was Mr. Dame who suggested the story on the way to the nurse's office. (Tr. 466.) Mr. Dame would not seek to punish Student H for skipping class, and in exchange, Student H would lie about the cause of his injury. (Tr. 469-70.) It was not until a week later that Student H first admitted that the door had caused his injury. (Tr. 473, 478, 481.) Finally, some days after the incident, Student H and Mr. Dame encountered each other in the hallway. Student H gave unrebutted testimony that Mr. Dame offered Student H a dollar, and asked whether "we continue to be friends." (Tr. 476-77.) The Hearing Officer concluded *Page 9 
that this was an additional inducement for Student H to maintain the fabricated story about slipping on water.
Again, the Hearing Officer is the appropriate person to resolve conflicting testimony. While it was possible that Student H fabricated the story on his own, in order to avoid punishment for skipping class, the Hearing Officer simply found that Student H's testimony was more believable because "[i]t is improbable that a student's desire to avoid the penalty for cutting class would give him a motive to lie about such a serious incident. . . ." (Commissioner's Decision 7.) Mr. Sauro also testified that Mr. Dame boasted about inducing Student H to fabricate the story. (Tr. 134.) Student N also testified that she left Mr. Dame and Student H alone at some point on the way to the nurse's office, so Mr. Dame had an opportunity to coerce the falsehood from Student H. (Tr. 428.) The Hearing Officer's conclusion that Mr. Dame induced Student H to lie, after intentionally slamming the door into him, was based upon her observations of the live testimony and is not clearly erroneous in view of this record.
The Commissioner's Decision relied on the findings that Mr. Dame intentionally slammed the door into Student H and then induced Student H to lie as the "cause" for termination and annulment. See § G.L. 1956 § 16-12-3 (stating that every teacher shall "aim to implant and cultivate in the minds of all children committed to his or her care the principles of morality and virtue.") While reasonable persons may disagree on the meaning of "morality and virtue," these principles clearly are not exhibited by causing physical injury to a student, and in order to avoid punishment, inducing that student to lie. Such conduct raises doubts about whether Mr. Dame may be trusted with the supervision of students in the future. Because the Hearing Officer's findings were not clearly *Page 10 
erroneous,[8] she properly concluded that cause existed for dismissal and annulment, the Board of Regents properly affirmed the Commissioner's Decision, and this Court will not disturb those decisions.
 IV Severity of Sanctions
Finally, Mr. Dame argues that even if the Court does not overturn the factual findings established before the agency, the Court should still require a lesser sanction. Mr. Dame argues that that his record is otherwise unblemished, and theories of "progressive discipline" would not result in termination or annulment for a first offense.
Mr. Dame has presented no authority requiring that the Providence School District or the DOE give Mr. Dame a "second chance" and risk physical injury to another student. The various officials had deferential discretion to impose lesser sanctions, other than to dismiss Mr. Dame or to annul his certificate. Yet this Court's role, on appeal, is limited in scope and focuses primarily on whether "cause" exists on the record before it. Mr. Dame argues that the agencies below should have applied progressive discipline, but the findings of fact here are significant. A finding that Mr. Dame intentionally struck a student, and then induced that student to lie, reasonably calls into question whether future students are safe in his care, and constitutes cause to dismiss and annul. Therefore, the Court cannot say that the decisions of the Hearing Officer, Commissioner, and Board of Regents constituted abuses of discretion, and does not disturb those decisions on appeal. *Page 11 
 V Conclusion
After review of the entire record, the Court finds that the Regents Decision upholding the Commissioner's Decision is not clearly erroneous and did not constitute an abuse of discretion. Accordingly, the Regents Decision is affirmed. Counsel for respondents shall submit an appropriate judgment for entry.
[1] The parties have agreed to use aliases in their briefs because of confidentiality concerns for the minor witnesses. Although the administrative record is replete with references to the students' names, and no attempt has been made to seal the record, the Court will adopt the use of aliases in its decision.
[2] It is not clear whether Student H's laceration, which was towards the back of his head and was approximately one and one-half inches long, (Tr. 53, 425, 468), was caused by the floor, the door, or the doorframe. It is clear, however, that the injury was caused by Mr. Dame's closing the door into Student H.
[3] Mr. Dame had been on the phone with the school nurse, who requested that Student N come to the nurse's office. Therefore, the three individuals left the classroom.
[4] Mr. Dame only testified when called as an adverse witness by the Providence School Department and the DOE; he never testified on his own behalf.
[5] One could question the veracity of Student C's testimony based on elusive responses to questions about his relationship with Student H. He initially admitted that he was friends with Student H, (Tr. 297:8, 312:7), and that Student H's mother had approached him to testify approximately a month and a half prior to his testimony, (Tr. 315-316). On cross examination, however, he said that he "really didn't have a relationship with [Student H]," but was over at his house on at least four occasions in the summer of 2004 prior to his testimony. (Tr. 321.) Student M states that she "always saw" Students H and C together. (Tr. 380.) Student H stated that he and Student C were "more than friends" and were third cousins as well. (Tr. 565-66.) However, the Hearing Officer credited his testimony, and even if Student C is not believed, the pertinent findings of the Hearing Officer are otherwise supported by the evidence.
[6] For example, shortly after the incident, Student M gave a written statement that Mr. Dame "kicked" the door closed. At the hearing, however, she states that Mr. Dame used his hand to close the door. (Tr. 399400.) Student C claims that Student H was bent over tying his shoes prior to the impact with the door. (Tr. 300-01). However, no other witness — including Student H — corroborated that testimony.See Tr. 461464 (Student H testified that he was upright prior to the impact).
[7] In support of his appeal, Mr. Dame relies on the fact that criminal assault charges against him were eventually dropped as evidence that he lacked intent to slam the door into Student H. However, the Court does not find this argument compelling because there are many reasons charges could be dropped — such as the inability to prove beyond a reasonable doubt — even if Mr. Dame did intentionally slam the door on Student H.
[8] Appellant dedicates 11 pages of his memorandum to an analysis of the facts, differing with the hearing officer. However, there is ample support for the hearing officer's findings and, when credibility determinations are at issue, the findings of the Hearing Officer should be owed great deference. Rossi v. Employee's Retirement System,895 A.2d 106, 110 (R.I., 2006). *Page 1